IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TIMOTHY CRONIN and JOSHUA FULLERTON, | ) ) ) | |
| Plaintiffs, | ) ) ) | 4:17CV3079 |
| v. | ) ) | |
| CHRIS PETERSON, in his individual and official capacity, JAMES PESCHONG, in his individual and official capacity, BRIAN JACKSON, in his individual and official capacity, TONYA PETERS, in her individual and official capacity, WILLIAM KOEPKE, in his individual and official capacity, DAREN REYNOLDS, in his individual and official capacity, and CITY OF LINCOLN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **MEMORANDUM AND ORDER** |
| Defendants. | ) ) ) | |

Plaintiffs Timothy Cronin and Joshua Fullerton, who are both City of Lincoln police officers, bring this 42 U.S.C. § 1983 action against the City of Lincoln, several members of the Lincoln Police Department, and an assistant city attorney who is assigned to advise the police department. Plaintiffs seek to bring section 1983 claims against Defendants in their individual and official capacities under the Fourth, Fifth, and Sixth Amendments, as well as a retaliation claim stemming from Plaintiff Cronin's exercise of his First Amendment rights. (Filing No. 19, Amended Complaint.)

Defendants have filed a Motion to Dismiss Plaintiffs' Amended Complaint (Filing No. 20) pursuant to Fed. R. Civ. P. 12(b)(6).[1] Defendants argue that Plaintiffs' claims against the City and the Defendants in their official capacities must be dismissed for failure to allege that a policy or custom caused violations of Plaintiffs' constitutional rights (Filing No. 21 at CM/ECF pp. 3-6, 11-12); that Plaintiffs' allegations do not state any constitutional claims (Filing No. 21 at CM/ECF pp. 6-9); that the Defendants in their individual capacities are entitled to qualified immunity from suit (Filing No. 21 at CM/ECF pp. 9-11, 12-14); and that Defendant Assistant City Attorney Tonya Peters is entitled to either absolute or qualified immunity (Filing No. 21 at CM/ECF pp. 14-15).

## I. FACTUAL ALLEGATIONS

Plaintiffs Timothy Cronin and Joshua Fullerton are police officers with the City of Lincoln Police Department ("LPD"). Defendant Chris Peterson is a LPD captain; James Peschong is the chief of the LPD; Brian Jackson is the assistant chief of the LPD; Tonya Peters is a City of Lincoln assistant city attorney who is assigned to the LPD as the police legal advisor; and William Koepke and Daren Reynolds are LPD sergeants. Plaintiffs allege that all of the Defendants are "vested by virtue of [their] position[s] with the City with the power and authority to formulate and enforce the custom and practices which resulted in violations of [P]laintiffs' constitutional rights . . . ." (Filing No. 19, Amended Complaint ¶¶ 3-19.)

After having worked under Defendant Peterson's supervision in the LPD narcotics unit, Plaintiff Cronin moved to uniform patrol, where he continued to perform narcotics investigations. When Cronin began to "have success" with narcotics

---

[1] The Motion to Dismiss states that the Defendants make their motion in their official capacities. (Filing No. 20.) However, their brief in support of their motion makes arguments on behalf of the Defendants in their individual capacities as well. (Filing No. 21.)

arrests and seizures, Peterson "began a pattern and practice of interference and harassment" against Cronin, including contacting his supervisors and attempting to stop his investigations. (Filing No. 19 ¶¶ 21-24.)

Cronin first alleges that in July 2014, Peterson attempted to interfere with Cronin's application to attend specialized training called "Desert Snow" by privately contacting Defendant Peschong, chief of the LPD, and lobbying against Cronin attending the training after the selection committee had already informed Cronin that he had been selected to attend. (Filing No. 19 ¶¶ 25-31.)

In August 2014, Cronin filed a complaint against Peterson with LPD's personnel sergeant based on Peterson's alleged discrimination, harassment, and creation of a hostile work environment, and the complaint was forwarded to the Lincoln Commission on Human Rights for investigation. Cronin claims that the City of Lincoln did not throughly investigate his claim against Peterson. (Filing No. 19 ¶¶ 32-33.)

More than a year later—in September 2015—Defendant Jackson, assistant chief of the LPD, told Cronin he had received a complaint alleging that Cronin had interfered with an Ohio illegal-steroid investigation. Cronin had a friend from Powell, Ohio, who owned a nutrition and supplement store, and from whom Cronin had previously purchased nutritional supplements "in conjunction with lifting weights, working out, and overall fitness." (Filing No. 19 ¶ 37.) Cronin's friend had been accused of selling illegal steroids, and Cronin had corresponded with him via text messages regarding the investigation and "reminding him of his rights in dealing with the police." (Filing No. 19 ¶ 38.) As a result of these text messages, a member of the Powell, Ohio, police department told Jackson that Cronin was interfering with their investigation.

Also in September 2015, Peschong "and/or" Jackson turned over the text messages to Peterson, who then used the texts to again harass, discriminate, and

retaliate against Cronin for the complaint Cronin had filed against Peterson with the LPD personnel sergeant. Cronin claims that Peterson's actions based on "mere text messages were contrary to the past practice and usual and ordinary actions taken by the Lincoln Police Department based upon similar information." (Filing No. 19 ¶ 44.) For example, Peterson failed to contact the DEA, conduct internet searches, or otherwise investigate whether the supplements at issue in Ohio were legal.

In investigating Cronin, Peterson allegedly obtained the assistance of Defendants Peters, Koepke, and Reynolds. On September 28, 2015, Defendant Koepke detained Cronin in a conference room at the LPD's Center Team Station, where Koepke told Cronin he was being criminally investigated, but the interview was not recorded by audio or video, contrary to LPD policy. Cronin alleges that Koepke advised him that "he was not under arrest but he was not free to leave"; did not advise him of his *Miranda* rights; allowed Cronin to call his legal counsel, but refused to leave the room so Cronin could consult with counsel privately; and when Cronin's counsel arrived, he was not allowed to meet with Cronin. (Filing No. 19 ¶¶ 47-54.)

Using statements obtained from Koepke's interview with Cronin, Peterson applied for search warrants for Cronin's home, vehicle, blood, urine, and cellular phone with "critical information omitted," such as Koepke's opinion that the substances referenced in the text messages were legal and Cronin's statement that he did not have any of the substances at issue at his house. Defendant Assistant City Attorney Peters, who allegedly knew or should have known that the information used in the search-warrant applications was obtained in violation of *Miranda*, assisted with the preparation of the search warrants. (Filing No. 19 ¶¶ 55-57.)

Cronin alleges that several searches supported by warrants then occurred. First, as part of Koepke's six-hour detention of Cronin, Koepke transported him to a hospital for a test of his blood and urine, the latter of which was obtained by threatening Cronin with the insertion of a catheter into his penis if he did not comply. Next, without seeing a search warrant, Defendant Reynolds and "other officers"

searched Cronin's house "with nothing illegal located." Likewise, Reynolds executed a search warrant for Cronin's 2015 Toyota 4 Runner on a completely different vehicle—Cronin's 2009 Ford Escape—for which Reynolds had no probable cause or consent to search, and in which Reynolds found nothing. Officers also allegedly searched Cronin's police vehicle and locker, neither of which contained illegal substances.  (Filing No. 19 ¶¶ 58-70.)

On September 28, 2015 (the same day as Cronin's detention), Plaintiff "Fullerton was contacted at his home and voluntarily turned over the substances he had obtained through Cronin." (Filing No. 19 ¶ 71.) The next day, Peterson contacted Fullerton to request an interview, during which Fullerton was not read his *Miranda* or *Garrity*[2] rights, was allowed to call counsel upon request, but was manipulated into talking to Peterson outside the presence of counsel.

Plaintiffs allege that search warrants or subpoenas were also obtained for Cronin's and Fullerton's cellular phone records, Cronin's personnel records, and Cronin's personal financial information, and that Cronin's cellular phone was seized on September 28, 2015.

On October 6, 2015, Cronin's blood and urine tests came back negative for illegal substances, and on October 8, 2015, the substances seized from Fullerton were determined to contain nothing illegal. On October 9, 2015—and without evidence that any of Cronin's text messages referred to illegal substances—members of the LPD "destroyed Cronin's phone in an alleged effort to extract any information card or chip within the device," thereby destroying Cronin's personal family photographs, including his newborn daughter, and other sensitive personal information. The phone chip was sent to an outside source for "potential extraction," but "no evidence was able to be obtained or extracted." (Filing No. 19 ¶¶ 78-88.)

---

[2] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

Despite the fact that Peterson was unable to link Cronin to any illegal activities, he continued his investigation for the next several months, including a December 2015 trip to Powell, Ohio, to conduct a follow-up investigation which yielded no evidence of Cronin's involvement with illegal steroids. In January 2016, Peterson requested and received "items" that had been seized by the Powell, Ohio, police department and took them to the Nebraska State Laboratory to be tested for the presence of illegal substances. (Filing No. 19 ¶¶ 89-93.)

For several months thereafter, Peterson asked unidentified prosecutors to bring charges against Cronin, but "[a]ll prosecutors declined to pursue charges because of a lack of evidence Cronin violated any laws or was ever involved in illegal steroids." (Filing No. 19 ¶¶ 94-95.) After prosecutors refused to bring criminal charges, Defendants City of Lincoln, Peschong, and Jackson began an internal-affairs investigation of Plaintiffs Cronin and Fullerton. In a meeting between Cronin and Defendant Jackson regarding that investigation, Jackson allegedly told Cronin he would be "exonerated" if Cronin agreed not to pursue legal action and that Cronin should "let this go." Jackson admitted to Cronin that "the investigation could have 'been handled better.'" (Filing No. 19 ¶¶ 98-99.)

Plaintiffs state in their Amended Complaint that Defendants have "made defamatory remarks to other officers, friends, and members of the public, claiming that Cronin and Fullerton are 'dirty' or otherwise impugning their reputation." (Filing No. 19 ¶ 104.)

Plaintiffs allege that Defendants City of Lincoln, Peschong, and Jackson knew or should have known that the searching officers lacked probable cause, but instead actively assisted with "the investigation and illegal activities engaged in by Peterson, Koepke, and Reynolds in support of the pattern and practice of discrimination, harassment, and retaliation spearheaded by Peterson." Further, Plaintiffs claim that Defendants City of Lincoln, Peschong, and Jackson knew or should have known that "the pattern and practice of conduct by Peterson was discriminatory and harassing,"

but they "failed to do anything to ensure Cronin was free from a hostile work environment and retaliation from the prior complaint." Finally, Plaintiffs assert that all Defendants' actions "were done pursuant to the custom and practice formulated and enforced by Defendants and were within the course and scope of their respective positions as employees of the City of Lincoln and under color of law." (Filing No. 19 ¶¶ 97, 100-01.)

As a result of the stress caused by Peterson's investigation, harassment, and discrimination, Cronin alleges he suffered physical symptoms. Further, Defendants Peschong and Jackson have allegedly denied Cronin opportunities for career advancement and specialized positions.

## II. STANDARD OF REVIEW

"[D]ismissal under Fed. R. Civ. P. 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir. 2001) (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)). "The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008). The complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

# III.  DISCUSSION

Plaintiffs bring section 1983 claims against Defendants in their individual and official capacities under the Fourth, Fifth, and Sixth Amendments, as well as a retaliation claim stemming from Plaintiff Cronin's exercise of his First Amendment rights. Plaintiffs request money damages and declaratory relief.

## A.  Individual-Capacity Claims

Defendants argue that they are entitled to dismissal either because Plaintiffs have failed to state a claim upon which relief can be granted or because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation, bracketing, and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation and citation omitted).

Qualified immunity requires a two-part inquiry at the Rule 12(b)(6) stage: (1) whether, on the face of the complaint, the facts alleged make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct such that a reasonable officer would understand the unlawfulness of his conduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009); *Schatz Family ex rel. Schatz v. Gierer*, 346 F.3d 1157, 1159 (8th Cir. 2003). "Courts

may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009). "If no reasonable factfinder could answer yes to both of these questions, the official is entitled to qualified immunity." *Nance*, 586 F.3d at 609.

"Clearly established" for purposes of qualified immunity "should not be defined at a high level of generality . . . [but] must be particularized to the facts of the case." *Lyons v. Vaught*, 875 F.3d 1168, 1172 (8th Cir. 2017) (internal quotation and citation omitted). That is, "a case directly on point" is not required in order to be "clearly established," but "existing precedent must have placed the . . . constitutional question beyond debate" at the time the defendants acted. *Id.* (internal quotation and citation omitted).

Finally, the doctrine of qualified immunity requires the court to analyze each defendant's actions individually because "a person may be held personally liable for a constitutional violation only if his *own* conduct violated a clearly established constitutional right." *Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017) (internal quotation and citation omitted; emphasis in original).

Accordingly, in reviewing the Defendants' Motion to Dismiss, the court will first examine whether the facts as alleged by Plaintiffs plausibly show that the individually-named Defendants have violated Plaintiffs' constitutional rights. If the alleged facts do not show a violation, the court need not proceed further with the qualified immunity analysis. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (if an official did not deprive plaintiff of a constitutional or statutory right, the plaintiff "does not need qualified immunity, as he is not liable under § 1983"); *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) ("[I]f the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. . . . This is not to say, however, the defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the §

1983 claim."(citations omitted)). Alternatively, if there was no constitutional violation, each Defendant is entitled to qualified immunity. *See Pearson v. Callahan, 555 U.S. 223, 243-44 (2009)* ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment."); *Kulkay v. Roy, 847 F.3d 637, 646 (8th Cir. 2017)* (finding individual defendants entitled to qualified immunity when plaintiff failed to state Eighth Amendment claim).

### 1. Fourth Amendment Claim

The Fourth Amendment provides:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Plaintiff Cronin alleges that Defendants violated his Fourth Amendment rights by detaining him for an unreasonable period of time, arresting him, and illegally searching and seizing his home, vehicle, cell phone, and person when he was forced to supply bodily fluids. Plaintiff Fullerton claims that Defendants unlawfully detained him and kept his property for an unreasonable amount of time after no illegal substances were found. Both Plaintiffs allege that the Defendants failed to provide the court with complete information when applying for search warrants that were issued without probable cause. (Filing No. 19 at CM/ECF pp. 14-15.)

### a. Cronin's Detention & Arrest

Cronin claims that Defendant Koepke violated his Fourth Amendment rights by detaining and interviewing him in a LPD conference room on September 28, 2015, telling Cronin that "he was not under arrest but he was not free to leave." Defendant

Peterson allegedly used the information gained during this detention to apply for search warrants for Cronin's vehicle, home, blood, urine, and cell phone. Cronin alleges that during this six-hour unlawful detention, he was transported to the hospital for forced blood and urine tests. (Filing No. 19 at CM/ECF p. 8.)

The Fourth Amendment prohibits unreasonable "seizures." A seizure occurs "'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Grant*, 696 F.3d 780, 784 (8th Cir. 2012) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)). Here, Cronin alleges that Koepke specifically told him that he was not free to leave, thereby constituting a "seizure" within the meaning of the Fourth Amendment.

The Amended Complaint in this case challenges two types of Fourth Amendment "seizures": (1) an investigative detention and (2) an arrest. *United States v. Davis*, No. 8:10CR438, 2011 WL 1456147, at *6 (D. Neb. Mar. 15, 2011), *findings and recommendation adopted*, No. 8:10CR438, 2011 WL 1361052 (D. Neb. Apr. 11, 2011) (delineating investigative detentions and arrests as two types of seizures).

> A law enforcement officer may detain a person for investigation without probable cause to arrest if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.

*United States v. Green*, 691 F.3d 960, 963 (8th Cir. 2012) (internal quotations and citations omitted; citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (holding that customs inspectors' articulable suspicion of drug smuggling permitted inspectors to detain suspect for 16 hours to either verify or dispel their suspicion; noting that "[t]he 'reasonable suspicion' standard has been applied in a number of contexts and effects a needed balance between private and public interests when law enforcement officials must

make a limited intrusion on less than probable cause"); *United States v. Eustaquio,* 198 F.3d 1068, 1070 (8th Cir. 1999) (when encounter becomes a Fourth Amendment seizure, it must be supported by reasonable suspicion of criminal activity; applying "reasonable suspicion" standard to investigative detention in airport); *United States v. Davis,* No. 8:13CR85, 2013 WL 3753941, at *6 (D. Neb. July 15, 2013) ("Investigative detentions are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity."); 2015 Winter AAJ-PAPERS 13, Police Misconduct Case Analysis: *Terry v. Ohio, Graham v. Connor,* and *Tennessee v. Garner* (2015) ("*Terry v. Ohio* applies to all states and to all criminal investigations, stops, detentions, and arrests.").

"It is well settled that, under the Fourth Amendment, [t]he scope of a detention must be carefully tailored to its underlying justification and that the investigatory methods employed [during a detention] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *El-Ghazzawy v. Berthiaume,* 636 F.3d 452, 459 (8th Cir. 2011) (internal quotations and citations omitted). In justifying an investigative detention, "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation." *United States v. Ortiz-Monroy,* 332 F.3d 525, 529 (8th Cir. 2003). "Reasonable suspicion does not, however, exist solely on the basis of an officer's hunch." *United States v. Griffith,* 533 F.3d 979, 984 (8th Cir. 2008).

"An investigative detention may turn into an arrest if it lasts for an unreasonably long time or if it is too intrusive." *Seymour v. City of Des Moines,* 519 F.3d 790, 796 (8th Cir. 2008) (internal quotations and citations omitted). If a seizure escalates into an arrest, the arrest must be supported by probable cause. *United States v. Bloomfield,* 40 F.3d 910, 916 (8th Cir. 1994). A seizure may become a *de facto* arrest when a law-enforcement officer's conduct is more intrusive than necessary; the detention involves delay unnecessary for legitimate investigation; police conduct

engenders fear and humiliation; or the officer transports the suspect to another location, isolates him from others, confines him to a police car, handcuffs him, or subjects the suspect to unnecessary delays. *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (investigative detention may become *de facto* arrest if officers use unreasonable force or if "it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention"); *United States v. Bloomfield*, 40 F.3d 910, 916-17 (8th Cir. 1994).

According to the allegations in the Amended Complaint, at the time Officer Koepke detained Cronin in the LPD conference room, the Defendants allegedly knew that the assistant chief of the LPD had received a complaint alleging that Cronin had interfered with an Ohio illegal-steroid investigation; Cronin had a friend from Powell, Ohio, who owned a nutrition and supplement store, and from whom Cronin had purchased nutritional supplements; Cronin's friend had been accused of selling illegal steroids in Ohio; Cronin had corresponded with his Ohio friend via text messages regarding that investigation and had counseled him regarding his rights in dealing with the police; and as a result of these text messages, a member of the Powell, Ohio, police department told the assistant chief of the LPD that Cronin was interfering with their investigation. Before Cronin was detained, Cronin's text messages had been given to Defendant Peterson, but Peterson failed to contact the DEA, conduct internet searches, or otherwise investigate whether the supplements at issue in Ohio were legal.

The question for qualified-immunity purposes is not whether reasonable suspicion for Cronin's detention *in fact* existed, but whether a reasonable officer facing the same circumstances could believe it was lawful to detain Cronin for six hours in the LPD conference room (which was Cronin's place of employment) in order to investigate Cronin's possible interference with the Ohio illegal-steroid investigation and Cronin's own possession of illegal steroids.

Certain steroids are controlled substances under Nebraska's Uniform Controlled Substances Act, Neb. Rev. Stat. § 28-405, Schedule III(d) (Westlaw 2018), which may not be dispensed without a "medical order." Neb. Rev. Stat. § 28-414.01(1) (Westlaw 2018). It is a felony for a person to knowingly or intentionally possess such a controlled substance with intent to manufacture, distribute, deliver, or dispense that substance. Neb. Rev. Stat. § 28-416 (Westlaw 2018).

Considering the information collectively known by the Defendants regarding Cronin's possible involvement with the interstate purchase and possession of steroids which could subject Cronin to felony charges under Nebraska law, it was objectively reasonable for Koepke to believe there was reasonable suspicion to detain Cronin in order to verify or dispel his suspicion. *See Montoya de Hernandez, 473 U.S. at 541*; *Green, 691 F.3d at 963*; *Eustaquio, 198 F.3d at 1070*. Thus, Cronin's investigative detention did not violate his Fourth Amendment right to be free from unreasonable seizures, and the Defendants' Motion to Dismiss must be granted for failure to state a 42 U.S.C. § 1983 claim under the Fourth Amendment on this ground and/or Defendants are entitled to qualified immunity from suit on this claim. *Kahle, 477 F.3d at 550*; *Ambrose, 474 F.3d at 1077 n.3*; *Pearson, 555 U.S. at 243-44*; *Kulkay, 847 F.3d at 646*.

As to Cronin's Fourth Amendment arrest claim, and based upon the allegations of the Amended Complaint alone, the court cannot determine whether a reasonable officer would believe that Cronin's investigative detention became an arrest supported by probable cause. The lack of allegations in the Amended Complaint make it impossible to determine whether Officer Koepke's conduct during the detention was more intrusive than necessary; whether the detention involved delay unnecessary for legitimate investigation; whether Koepke's conduct engendered fear and humiliation; whether he used unreasonable force; and whether what Koepke learned from Cronin would lead a reasonable officer to believe that a criminal offense had been or was being committed—all necessary inquiries in determining whether a reasonable officer

facing the same circumstances would have been justified in believing he had probable cause to arrest Cronin.

Because the Amended Complaint does not establish immunity on its face as to Cronin's arrest claim, the Motion to Dismiss this claim on the ground of qualified immunity will be denied without prejudice to raising the issue in a properly supported motion for summary judgment.[3] *See* *O'Meara for O'Meara v. Heineman*, No. 8:09CV157, 2010 WL 11527152, at *4 (D. Neb. Feb. 17, 2010) ("Because the first amended complaint does not establish immunity on its face, I will deny the motion to dismiss on the ground of qualified immunity. This does not, however, preclude a later motion for summary judgment reasserting qualified immunity."); *Estate of Wondercheck ex rel. Wondercheck v. Nebraska*, No. 4:06CV3087, 2006 WL 2010216, at *3 (D. Neb. July 14, 2006) (denying motion to dismiss based on qualified immunity without prejudice to reassertion in properly supported motion for summary judgment).

### b.  Invalid Search Warrants

Plaintiff Cronin alleges that Defendant Peterson used statements gained from his detention in order to obtain search warrants for Cronin's vehicle, home, blood, urine, and cellular phone and, in doing so, "intentionally or recklessly" omitted "critical information" from the warrant applications, "including but not limited to the

---

[3]If qualified immunity is raised on summary judgment regarding the alleged warrantless arrest, counsel should note the Supreme Court's guidance that because it is difficult for officers "to know how the general standard of probable cause applies in the precise situation encountered," whether an officer violates "clearly established law" in the probable-cause context requires "identify[ing] a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment" in order for it to be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, No. 15-1485, 2018 WL 491521, at *11 (U.S. Jan. 22, 2018) (internal quotations and citations omitted).

fact that Koepke was of the opinion that the items referenced in the text messages were legal substances, that this was a misunderstanding, and that Cronin stated that he did not have any substances at his house because they were taken to completion." (Filing No. 19 ¶¶ 55-57, 108.) Cronin claims that Defendant Peters, who was an assistant city attorney and police legal advisor, "knew or should have known that the information used in the affidavit was obtained in violation of *Miranda*[4], but she still assisted with the preparation of search warrants to be presented to the Court, with critical information omitted." (Filing No. 19 ¶ 56.)

"Under *Franks* [*v. Delaware*, 438 U.S. 154 (1978)], if an officer omits critical information from a search warrant application and obtains a warrant, the resultant search may be unreasonable under the Fourth Amendment," *United States v. Stropes*, 387 F.3d 766, 771 (8th Cir. 2004), and the officer may be subject to liability under 42 U.S.C. § 1983. *Hawkins v. Gage County*, 759 F.3d 951, 958 (8th Cir. 2014). However, "[a] law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." *Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2011).

Thus, omissions can vitiate a search warrant only if "(1) the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, and (2) the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Hawkins v. Gage Cty.*, 759 F.3d 951, 959 (8th Cir. 2014) (quotation omitted). Furthermore, to prove "reckless disregard," a plaintiff must "show that the omitted material would be clearly critical to the finding of probable cause." *Id*. (quotation omitted).

*Schaffer v. Beringer*, 842 F.3d 585, 594 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 2299 (2017). *See also* *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) ("A

---

[4]The *Miranda* issue is addressed in the "Fifth Amendment" section below.

search warrant is void . . . if the defendant proves by a preponderance of the evidence that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit and the affidavit does not establish probable cause without the false statement.").

Here, the Plaintiffs allege that Defendant Peterson, with Peters's assistance, intentionally, or with reckless disregard, omitted specific information from the affidavits in support of the search warrants. The question for qualified immunity purposes is whether a reasonable police officer in Peterson's position would have known that had the allegedly omitted information been included in the search warrant application, a reasonable officer would not have been able to show probable cause and, therefore, should not have applied for, nor executed, the warrants. *See Messerschmidt v. Millender*, 565 U.S. 535, 553, 556 (2012) (the issue for qualified immunity purposes is not whether the facts *actually* establish probable cause because qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments"; rather, the issue is whether the warrants were "so obviously lacking in probable cause that the officers can be considered plainly incompetent for concluding otherwise" (internal quotations and citations omitted)).

Because Plaintiffs have failed to attach to their Amended Complaint a copy of the search warrants at issue or their supporting affidavits, it is impossible to analyze whether "the affidavit, if supplemented by the omitted information[,] would not have been sufficient to support a finding of probable cause." *Hawkins*, 759 F.3d at 959 (quotation omitted). For example, while part of the alleged omitted information was that Cronin did not possess any of the alleged steroids at his home because he ingested all of them, there could well have been other information contained in the affidavit from which a reasonable officer could have concluded that there was "a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Accordingly, because the Amended Complaint does not establish immunity on its face as to Cronin's invalid-warrant claim against Peterson and Peters, the Motion to Dismiss this claim on the ground of qualified immunity will be denied without prejudice to raising the issue in a properly supported motion for summary judgment.

### c.   Execution of Search Warrants for Cronin's Home, Person, Vehicle & Phone

"Whether a warrant is properly issued . . . is a separate question from whether it is reasonably executed, which is governed by the Reasonableness Clause of the Fourth Amendment." *United States v. Hamilton*, 591 F.3d 1017, 1025 (8th Cir. 2010). Plaintiff Cronin alleges that the Defendants who executed the search warrants for his home, person, vehicle, and phone did so unreasonably within the meaning of the Fourth Amendment.

In order to assert a § 1983 claim, the "plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added); *see also Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017) ("a person may be held personally liable for a constitutional violation only if his *own* conduct violated a clearly established constitutional right" (internal quotation and citation omitted)); *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) ("To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." (citation omitted)).

Insofar as his warrant-execution claims are concerned, Cronin alleges that Reynolds "and other officers" searched his home, Defendant Koepke transported Cronin for the search of his person (urine and blood tests), Reynolds searched Cronin's vehicle, and "members of the Lincoln Police Department" destroyed Cronin's cell phone in an effort to access information in the device. Since Cronin's allegations against "officers" and "members of the Lincoln Police Department" do not

allege individual, personal involvement by any named individual defendants, I shall construe Cronin's warrant-execution claims as being asserted only against those named Defendants who were alleged to be personally involved in the claimed constitutional violations—that is, Officers Reynolds and Koepke.[5]

"In order to show that a law enforcement official is not entitled to qualified immunity with regard to the execution of a search warrant, the [plaintiff] must establish that from the perspective of a reasonably objective police officer on the scene, without regard to the actual intent or motivation of [the officers executing the search warrant], their conduct was not objectively reasonable." *Walden v. Carmack, 156 F.3d 861, 873 (8th Cir. 1998)*. "[I]f an officer acts in a manner about which officers of reasonable competence could disagree, the officer should be immune from liability." *Whitten v. City of Omaha, 199 F. Supp. 3d 1224, 1233 (D. Neb. 2016)*.

Here, Cronin alleges that while executing the search warrants, Defendants Reynolds and Koepke violated the Fourth Amendment in four particulars, each of which shall be discussed individually below:

### (i) Searching Without Knowing Contents of Warrants

Cronin broadly alleges that "[t]he Defendants" (construed to be Defendants Reynolds and Koepke for the reasons discussed above) intentionally or with reckless disregard for Cronin's rights conducted their searches without seeing the search

---

[5]Cronin's broad and conclusory allegation that Defendants Peschong and Jackson "knew or should have known that the officers lacked probable cause but instead stood by or actively assisted the officers with the investigation and illegal activities engaged in by Peterson, Koepke, and Reynolds in support of the pattern and practice of discrimination, harassment, and retaliation spearheaded by Peterson" does not "plead facts that plausibly show direct involvement" by Peschong and Jackson in the execution of the search warrants. *Jackson v. Nixon, 747 F.3d 537, 545 (8th Cir. 2014)*. (Filing No. 19 ¶ 101.)

warrants, without having knowledge of what was contained in the affidavits submitted in support of the warrant applications, and without having full knowledge of the facts, circumstances, or alleged illegal items or evidence to be seized. (Filing No. 19 ¶¶ 58-60.) Cronin seems to allege that the officers conducted searches knowing that warrants authorized the searches, but without knowing what they were searching for—as in the analogous situation where officers perform a search pursuant to a warrant that completely fails to describe the items to be seized.

In *Groh v. Ramirez*, 540 U.S. 551 (2004), the Supreme Court held that officers executing a search warrant were not entitled to qualified immunity when the warrant at issue "did not describe the items to be seized *at all*," in effect making the search "'warrantless' within the meaning of our case law," which is "presumptively unreasonable""absent consent or exigency." *Groh*, 540 U.S. at 554, 564.

> It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted. Because petitioner did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly "unreasonable" under the Fourth Amendment. The Court of Appeals correctly held that the search was unconstitutional.

*Groh*, 540 U.S. at 563 (footnote omitted). Under such circumstances, and "[g]iven that the particularity requirement is set forth in the text of the Constitution," the Court held that "no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid," particularly when "even a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Groh*, 540 U.S. at 563.

Here, Officers Koepke and Reynolds apparently exercised restraint in performing the searches because the Amended Complaint does not allege that the officers exceeded the scope of the search warrants (with the exception of searching

the wrong vehicle, discussed below).  However, because the officers allegedly did not see or know the contents of the search warrants before executing them, "'the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer.'" *Groh*, 540 U.S. at 560 (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)).

Therefore, on the sole basis of the allegations in the Amended Complaint, Defendants Koepke and Reynolds are not entitled to qualified immunity on Cronin's general warrant-execution claim because it was not objectively reasonable to execute the search warrants without seeing them or knowing what was to be seized under them. *See Groh*, 540 U.S. at 563; *United States v. Leon*, 468 U.S. 897, 925 n.24 (1984) ("Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.").  I now turn to specific aspects of the warrant-execution claims raised by Plaintiffs.

### (ii) Blood & Urine Tests

The Amended Complaint alleges that, while Officer Koepke was detaining Cronin for six hours to investigate Cronin's potential criminal activity, he transported Cronin to the hospital for blood and urine tests under the following circumstances: (1) a search warrant had been issued allowing the tests; (2) Koepke had not seen the warrant and did not know what could be seized under it; (3) Koepke thought the substances  referenced in Cronin's text messages to his friend in Ohio—who was the subject of an illegal-steroid investigation—were legal; and (4) Koepke thought the situation was "a misunderstanding." (Filing No. 19 ¶¶ 48-59.)

As indicated above, for purposes of Plaintiffs' warrant-execution claims, I have likened the situation alleged here—i.e., the officers executed the warrants without seeing the warrants or knowing what could be seized under them—to a warrantless

search and seizure. The clearly established law involving the warrantless collection of bodily fluids at the relevant time required analyzing whether an exigency existed based on the totality of the circumstances to determine whether officers could lawfully dispense with the warrant requirement, such as where "a significant delay in testing will negatively affect the probative value of the results" and "would . . . threaten the destruction of evidence." *Missouri v. McNeely*, 569 U.S. 141, 152 (2013). There are no allegations of such an exigency here.

Therefore, on the face of the Amended Complaint, Koepke is not entitled to qualified immunity because a reasonably objective police officer, under clearly established law, would not have forced a suspect to undergo blood and urine tests without seeing the search warrant and without knowing what was to be seized under it, particularly when there was no apparent exigency and the officer—after interviewing the suspect for approximately six hours—thought that only legal substances were involved and the whole situation was simply a misunderstanding. *See Groh*, 540 U.S. at 563; *Leon*, 468 U.S. at 925 n.24.

## (iii) Search of Wrong Vehicle

The Amended Complaint next alleges that Defendant Reynolds searched Cronin's 2009 Ford Escape when the search warrant (which he had allegedly not seen and the contents of which he was unaware) permitted only a search of Cronin's 2015 Toyota 4 Runner. (Filing No. 19 ¶¶ 64-66.) Thus, the question for qualified-immunity purposes is whether a reasonably objective officer could have believed that a warrantless search of Cronin's vehicle was lawful in light of clearly established law and the information he possessed at the time of the search.

"In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement," *Riley v. California*, 134 S. Ct. 2473, 2482 (2014), such as "searches incident to arrest, protective sweeps, searches under exigent circumstances, discovery of items based on plain perception, the automobile

exception, searches for the purpose of administrative and special needs, and the 'stop and frisk' doctrine." 3A Fed. Prac. & Proc. Crim. § 675 (4th ed.) (Westlaw 2018).

Even assuming the search of Cronin's Ford Escape fell within the "automobile exception" (which the allegations in the Amended Complaint do not support) such that a warrant was not required, the searching officer was still required to have probable cause to search the car, and "if probable cause does not exist, the search is invalid." 3A Fed. Prac. & Proc. Crim. § 680 (4th ed.) (Westlaw 2018) (collecting cases). The Amended Complaint does not contain any allegations suggesting there was reasonable or probable cause to believe that evidence of a crime would be found in Cronin's 2009 Ford Escape before Officer Reynolds searched it without a warrant.

Because an officer could not have reasonably believed that a warrantless search of a vehicle in these circumstances was lawful in light of clearly established law and the information Reynolds possessed which—according to the scant allegations in the Amended Complaint involving Reynolds—was nothing, Officer Reynolds is not entitled to qualified immunity on this claim on the face of the Amended Complaint.

## (iv) Destruction of Cell Phone

Other than referring to "members of the Lincoln Police Department," the allegations in the Amended Complaint do not specify which Defendants were personally involved in seizing Cronin's cellular phone and in destroying his phone in "an alleged effort to extract any information card or chip within the device." (Filing No. 19 ¶ 81, 85.) Therefore, this aspect of Cronin's Fourth Amendment claim must be dismissed for failure to make any allegations against any of the named Defendants. *Iqbal*, 556 U.S. at 678 (complaint must contain "factual content that allows a court to draw the reasonable inference that the defendant is liable for the conduct alleged").

### d. Fullerton's Detention

The Amended Complaint alleges that one day after Fullerton "was contacted at his home and voluntarily turned over the substances he had obtained through Cronin," Defendant Peterson contacted Fullerton and requested an interview. (Filing No. 19 ¶¶ 71-72.) Although not clear, the interview apparently occurred on September 29, 2015 (one day after Cronin was questioned), and during it, Fullerton was not advised of *Miranda* or *Garrity* warnings, and Peterson used his "position as a member of the command staff to manipulate Fullerton into talking with him outside the presence of his legal counsel." (Filing No. 19 ¶¶ 72-77.) The Amended Complaint alleges no further details regarding Fullerton's "detention," such as the location of the "interview"; whether other officers were present; whether Peterson physically touched Fullerton; whether Peterson's questioning was intimidating, threatening, or coercive; and whether Peterson used language or a tone of voice indicating that Fullerton was not free to leave.

The lack of allegations in the Amended Complaint regarding what Plaintiffs characterize as Fullerton's "detention" makes it impossible to determine on a motion to dismiss the fundamental question whether Fullerton was "seized" within the meaning of the Fourth Amendment. *Grant*, 696 F.3d at 784 (a seizure occurs "'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave'" (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984))). If no "seizure" occurred, the Fourth Amendment was not implicated and Defendant Peterson obviously could not have violated Fullerton's Fourth Amendment right to be free from unreasonable seizures, entitling Peterson to dismissal for failure to state a claim and/or because he is entitled to qualified immunity from suit on this claim. *Andrews v. Fuoss*, 417 F.3d 813, 816 (8th Cir. 2005) (to establish a § 1983 Fourth Amendment unreasonable-seizure claim, plaintiff must first demonstrate she was seized within the meaning of the Fourth Amendment); *Kahle*, 477 F.3d at 550; *Ambrose*, 474 F.3d at 1077 n.3; *Pearson*, 555 U.S. at 243-44; *Kulkay*, 847 F.3d at 646.

Even assuming Peterson's "interview" of Fullerton *did* constitute a "seizure" entitled to Fourth Amendment protection, Defendant Peterson is entitled to qualified immunity from suit on this claim for the same reasons explained above with regard to Plaintiff Cronin's investigative detention. Fullerton's "interview" is alleged to have taken place the day after Cronin was interviewed and the day after Fullerton voluntarily gave officers substances he had obtained through Cronin. So at the time Peterson detained Fullerton, he would have known of Cronin's possible involvement with the interstate purchase and possession of steroids which could subject Cronin to felony charges under Nebraska law, and that Fullerton had procured substances from Cronin which Peterson then had in his possession. Under these circumstances, it was objectively reasonable to believe there was reasonable suspicion to detain Fullerton in order to verify or dispel Peterson's suspicion that Fullerton might also be involved in the interstate purchase and possession of illegal steroids. *See Montoya de Hernandez*, 473 U.S. at 541; *Green*, 691 F.3d at 963; *Eustaquio*, 198 F.3d at 1070.

Assuming Fullerton's investigative detention was a "seizure," it did not violate his Fourth Amendment right to be free from unreasonable seizures, and the Defendants' Motion to Dismiss must be granted for failure to state a 42 U.S.C. § 1983 claim based on the Fourth Amendment and/or because Defendant Peterson is entitled to qualified immunity from suit on this claim. *Kahle*, 477 F.3d at 550; *Ambrose*, 474 F.3d at 1077 n.3; *Pearson*, 555 U.S. at 243-44; *Kulkay*, 847 F.3d at 646.

## e. Prolonged Seizure of Fullerton's Property

Plaintiff Fullerton alleges that after he voluntarily gave to Defendants substances he had obtained through Cronin, and after those substances were tested and found not to be illegal, Defendants retained such property for an unreasonable amount of time, therefore violating the Fourth Amendment. (Filing No. 19 ¶¶ 83-84, 108.)

"Numerous courts have held that the Fourth Amendment protects a person from the unreasonable seizure of personal property, but not against what happens to the property after seizure (i.e., prolonged or indefinite retention, damage, or destruction)." *Gilmore v. Dubuc*, No. CIV. 13-1019, 2015 WL 3645846, at *2 (D. Minn. June 10, 2015), *aff'd sub nom. Gilmore v. City of Minneapolis*, 837 F.3d 827 (8th Cir. 2016) (citing cases); *see also Hudson v. Palmer*, 468 U.S. 517, 538-39 (1984) ("if the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government's custody is not itself of Fourth Amendment concern"; "The loss, theft, or destruction of property so seized has not, to my knowledge, ever been thought to state a Fourth Amendment claim.") (O'Connor, J., concurring); *Hopkins v. City of Bloomington*, No. CIV. 12-1943, 2013 WL 5406671, at *10 (D. Minn. Sept. 25, 2013), *aff'd*, 774 F.3d 490 (8th Cir. 2014) (holding that city's prolonged retention of plaintiff's vehicle after seizure did not raise cognizable Fourth Amendment claim because all circuit courts that have addressed the question have found that continued retention of property potentially implicates due process, not the Fourth Amendment) (citing cases); *Gallo v. Pillow*, No. 3:05 CV 00272, 2007 WL 865485, at *4 (E.D. Ark. Mar. 20, 2007) ("Because keeping property too long is not a clear violation of the Fourth Amendment . . . [the officer and investigator who executed the search warrants] are entitled to qualified immunity.").

Therefore, Fullerton has failed to state a 42 U.S.C. § 1983 claim under the Fourth Amendment regarding the prolonged detention of his seized property and/or Defendants are entitled to qualified immunity on this claim. *Kahle*, 477 F.3d at 550; *Ambrose*, 474 F.3d at 1077 n.3; *Pearson*, 555 U.S. at 243-44; *Kulkay*, 847 F.3d at 646.

### 2. Fifth Amendment

Plaintiffs next allege that Defendants violated their Fifth Amendment rights by failing to advise them of their *Miranda* rights and their right to be free from self-incrimination and then using statements obtained in violation of the Fifth Amendment to procure search warrants. (Filing No. 19 at CM/ECF p. 16.)

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment[6], provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The nature of the right protected by the Self-Incrimination Clause is, in turn, protected by the "*Miranda* rule," which "creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." *United States v. Patane*, 542 U.S. 630, 639-41 (2004); *see also Miranda v. Arizona*, 384 U.S. 436 (1966).

To the extent Plaintiffs are challenging Defendants' alleged violation of the "core privilege against self-incrimination," *Patane*, 542 U.S. at 639, it is clear that one may assert the Fifth Amendment self-incrimination privilege in any proceeding—whether it is civil, criminal, administrative, judicial, investigatory, or adjudicatory—but "a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003) (plurality); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." (citations omitted)).

Here, because Plaintiffs do not allege that they were charged with crimes based on the Defendants' investigation and that they were compelled to be witnesses against themselves in such criminal cases, Plaintiffs have failed to state a Fifth Amendment claim. *See Winslow v. Smith*, 696 F.3d 716, 731 n.4 (8th Cir. 2012) (no § 1983 claim stated based on Fifth Amendment because plaintiffs did not proceed to criminal trial; violation of Fifth Amendment Self-Incrimination Clause does not occur until

---

[6]Plaintiffs do not allege that the Defendants violated their Fourteenth Amendment substantive due process right to be free from coercive interrogation.

statements compelled by police interrogation are used at criminal trial); *Entzi v. Redmann*, 485 F.3d 998, 1002 (8th Cir. 2007) ("the general rule is that a person has no claim for civil liability based on the Fifth Amendment's guarantee against compelled self-incrimination unless compelled statements are admitted against him in a criminal case"); *Hancock v. Chancellor*, No. 5:17-CV-05018, 2017 WL 1735168, at *2 (W.D. Ark. May 3, 2017) (no § 1983 claim under Fifth Amendment in case where detectives and transport officers questioned plaintiff, but plaintiff did not allege that any statements made during questioning were used against him at trial).

Plaintiffs are likewise not entitled to relief because Defendants failed to administer *Miranda* warnings before questioning them. The Supreme Court has clearly stated that "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *Patane*, 542 U.S. at 641.

> [P]olice do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy" for any perceived *Miranda* violation.

*Patane*, 542 U.S. at 641-42 (quoting *Chavez*, 538 U.S. at 790).

In *Chavez*, a criminal suspect brought a § 1983 action against a police officer for the violation of his Fifth Amendment rights after the officer interrogated the suspect—who had been shot by another police officer—in the hospital. Because criminal charges were never filed against the suspect such that he was compelled to be a witness against himself in a criminal case, a plurality of the Supreme Court held that "[t]he text of the Self-Incrimination Clause simply cannot support the . . . view that the mere use of compulsive questioning, without more, violates the Constitution." *Id*. at 766-67 ("We fail to see how, based on the text of the Fifth Amendment, [the § 1983 plaintiff] can allege a violation of this right, since [the plaintiff] was never

prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case.").

Accordingly, the Defendants' Motion to Dismiss shall be granted for failure to state a 42 U.S.C. § 1983 claim under the Fifth Amendment and/or because Defendants are entitled to qualified immunity on this claim. *Kahle*, 477 F.3d at 550; *Ambrose*, 474 F.3d at 1077 n.3; *Pearson*, 555 U.S. at 243-44; *Kulkay*, 847 F.3d at 646.

### 3. Sixth Amendment Claim

Plaintiffs' next claim is that Defendants violated their Sixth Amendment rights when Defendants did not allow Plaintiffs to confer with legal counsel, engage in private conversations with counsel, or to have counsel present during interrogation and when Defendants continued to interrogate Plaintiffs after counsel had been requested. (Filing No. 19 at CM/ECF p. 17.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right of the accused to assistance of counsel "is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). A prosecution is "commenced" when adversary judicial criminal proceedings are initiated, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery*, 554 U.S. at 198 (internal quotation and citation omitted). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Id.* at 213; *see also United States v. Morriss*, 531 F.3d 591, 594 (8th Cir. 2008) (same).

Here, because Plaintiffs do not allege that the Defendants' investigation ever resulted in a criminal prosecution that would trigger their Sixth Amendment right to counsel, Plaintiffs have failed to state a § 1983 claim under the Sixth Amendment. *Warren v. City of Lincoln, Neb.*, 864 F.2d 1436, 1442 (8th Cir. 1989) (no § 1983 claim under Sixth Amendment against police officers who imprisoned plaintiff, denied him access to counsel, and interrogated, fingerprinted, and photographed him because plaintiff "never was subjected to adversary judicial criminal proceedings such as formal charges, arraignment, or indictment").

As with Plaintiffs' Fifth Amendment claim discussed above, the Defendants' Motion to Dismiss shall be granted for failure to state a 42 U.S.C. § 1983 claim under the Sixth Amendment and/or because the Defendants are entitled to qualified immunity on this claim. *Kahle*, 477 F.3d at 550; *Ambrose*, 474 F.3d at 1077 n.3; *Pearson*, 555 U.S. at 243-44; *Kulkay*, 847 F.3d at 646.

## 4. Retaliation Claim for Exercising First Amendment Rights

Finally, Plaintiff Cronin alleges that in retaliation for filing a grievance with LPD's "personnel sergeant" against Defendant Peterson on August 27, 2014—which was based on Peterson's "ongoing pattern and practice of harassment" of Cronin—Defendant Peterson spearheaded an aggressive, long-term campaign of more discrimination, harassment, and retaliation against Cronin that involved several LPD employees and that caused Cronin to suffer physical symptoms and be denied opportunities for career advancement and specialized positions. (Filing No. 19 at CM/ECF p. 18.)

To prevail on a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. *See*

*Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right. *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013).

The first issue is whether Cronin's "speech" (here, the filing of a grievance with LPD's "personnel sergeant" against a fellow city employee) is activity protected by the First Amendment. "'The inquiry into the protected status of speech is one of law, not fact.'" *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 832 (8th Cir. 2015) (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983)).

The First Amendment protects a public employee's speech so long as it addresses a matter of public concern. *Hemminghaus v. Missouri*, 756 F.3d 1100, 1110 (8th Cir. 2014) (if public employee does not speak as a citizen on matter of public concern, the employee "has no First Amendment cause of action based on his or her employer's reaction to the speech"); *Meyers v. Neb. HHS*, 324 F.3d 655, 659 (8th Cir. 2003) (citing *Connick*, 461 U.S. at 146). Speech qualifies as a matter of public concern if it is "'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Meyers*, 324 F.3d at 659 (quoting *Connick*, 461 U.S. at 146)).

If the speech at issue is purely job-related, it does not qualify as a matter of public concern and does not constitute protected speech under the First Amendment. *Anzaldua*, 793 F.3d at 833 ("If the main motivation for the speech was furthering [the employee's] private interests rather than to raise issues of public concern, her speech is not protected, even if the public would have an interest in the topic of her speech." (internal quotation and citation omitted)); *Steckelberg v. Rice*, 184 F. Supp. 3d 746, 756 (D. Neb. 2016) ("when a public employee's speech is purely job-related, that speech will not be deemed a matter of public concern. Unless the employee is speaking as a concerned citizen, and not just as an employee ["concerned with the circumstances of his own employment"], the speech does not fall under the protection

of the First Amendment." (internal citation omitted)); *Ginter v. City of Ashland*, No. 8:05CV148, 2005 WL 2347234, at *4 (D. Neb. Sept. 26, 2005) (same).

None of Cronin's allegations in the Amended Complaint indicate that his personnel complaint against Peterson was at all related to any matter of political, social, or other concern to the community; rather, Cronin's complaint was purely related to how Peterson's behavior affected the circumstances of Cronin's own employment—that is, that Cronin suffered adverse physical symptoms and was denied opportunities for career advancement and specialized positions. Because this does not constitute "speech" protected by the First Amendment, Cronin has not stated an actionable First Amendment claim under § 1983. *See Hoffmann v. Mayor, Councilmen & Citizens of City of Liberty*, 905 F.2d 229, 233 (8th Cir. 1990) (former police officer's filing of grievance pursuant to City's personnel rules complaining of his dismissal was "wholly personal" and did not "touch any matters that can be even remotely considered to be of interest to the public"; therefore, plaintiff did not engage in conduct protected under the First Amendment and had no submissible § 1983 claim on that basis); *Ginter*, 2005 WL 2347234, at *4 ("The filing of a formal grievance . . . is not protected activity unless it touches upon a matter of public concern."); *see also Lyons v. Vaught*, 875 F.3d 1168, 1170 & 1175 (8th Cir. 2017) (speech by teacher during grade-appeal process was not protected against public-employer retaliation because "a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command").

For the same reasons discussed above with regard to Plaintiffs' Fifth and Sixth Amendment claims, Defendants' Motion to Dismiss shall be granted for failure to state a 42 U.S.C. § 1983 claim under the First Amendment and/or because the Defendants are entitled to qualified immunity on this claim. *Kahle*, 477 F.3d at 550; *Ambrose*, 474 F.3d at 1077 n.3; *Pearson*, 555 U.S. at 243-44; *Kulkay*, 847 F.3d at 646.

**5.  Defendants' Claim That Peters Has Absolute or Qualified Immunity**

Defendant Peters argues that she is entitled to absolute immunity or, at the very least, qualified immunity from suit on Plaintiffs' claims. The Amended Complaint alleges that Peters was an assistant city attorney for the City of Lincoln who was assigned to the LPD as a legal advisor; that Peterson enlisted Peters's help in investigating Cronin and in retaliating against Cronin for filing a complaint against Peterson; and that Peters assisted with the preparation of the search warrants to be presented to the court, knowing that critical information had been omitted. (Filing No. 19 ¶¶ 15, 47, 56, 120.)

> Prosecutors may be entitled to either absolute or qualified immunity from civil liability under 42 U.S.C. § 1983 for actions undertaken pursuant to their official duties.  If the prosecutor is acting as advocate for the state in a criminal prosecution, then the prosecutor is entitled to absolute immunity. Absolute immunity covers prosecutorial functions such as the initiation and pursuit of a criminal prosecution, the presentation of the state's case at trial, and other conduct that is intimately associated with the judicial process.  In contrast, a prosecutor is entitled only to qualified immunity when [s]he pursues actions in an investigatory or administrative capacity. In determining whether particular actions of government officials fit within the absolute or qualified immunity standard, the Supreme Court has adopted a functional approach that looks to the nature of the function performed, not the identity of the actor who performed it.

*Brodnicki v. City of Omaha*, 75 F.3d 1261, 1266 (8th Cir. 1996) (internal quotation marks omitted) (citing *Burns v. Reed*, 500 U.S. 478 (1991); *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993); *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Forrester v. White*, 484 U.S. 219 (1987)); *see also Anderson v. Larson*, 327 F.3d 762, 768 (8th Cir. 2003).

Using this functional approach, the Supreme Court has decided that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding or

appears in court to present evidence in support of a search warrant application. However, absolute immunity does not apply when a prosecutor gives legal advice to police during a criminal investigation, acts as a complaining witness in support of a warrant application, *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009), or performs "investigatory functions that do not relate to . . . preparation for the initiation of a prosecution or for judicial proceedings." *Buckley*, 509 U.S. at 273 ("We do not believe . . . that advising the police in the investigative phase of a criminal case is so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity" (internal quotation marks and citation omitted)); *see also Burns*, 500 U.S. at 492 ("[W]e hold that respondent's appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing are protected by absolute immunity."); *Christensen v. Quinn*, 45 F. Supp. 3d 1043, 1088 (D.S.D. 2014) (prosecutor's assistance in drafting affidavits for search warrant applications and appearance in court in support of such applications protected by absolute immunity).

While "giving legal advice to police during an investigation strips a prosecutor of absolute immunity for that act because it is not a normal part of prosecution," "the doctrine of qualified immunity remains available . . . for that act." *Anderson*, 327 F.3d at 769. If a prosecutor is not acting as an "advocate for the state in a criminal prosecution" such that absolute immunity would apply, the prosecutor may be entitled to qualified immunity "when he pursues actions in an investigatory or administrative capacity." *Brodnicki*, 75 F.3d at 1266 (internal quotation marks and citation omitted).

On the face of the Amended Complaint, it appears that Peters did nothing that related to the initiation of a prosecution against Cronin and Fullerton, as they were never criminally charged. The allegation that Peters "assisted with the preparation of search warrants to be presented to the Court" (Filing No. 19 ¶ 56) does not indicate that she appeared in court as an advocate for the City of Lincoln to present evidence in support of search warrant applications. Further, while the Amended Complaint states that Peterson "enlisted" Peters's help in investigating and retaliating against

Cronin, the Amended Complaint does not state if, or how, Peters "helped" with those tasks. The only thing certain at this point is that Peters is not entitled to absolute immunity because she is not alleged to have taken any actions to initiate a prosecution against the Plaintiffs. *Schenk v. Chavis*, 461 F.3d 1043, 1046 (8th Cir. 2006) ("[P]urely administrative or investigative actions that do not relate to the initiation of a prosecution do not qualify for absolute immunity.").

While Peters is not entitled to absolute immunity on these allegations, it is possible that Peters's activities could entitle her to qualified immunity. However—and as explained above with regard to Cronin's invalid-warrant claim against Peterson for omitting critical information from the search warrant applications—because the Amended Complaint does not establish qualified immunity on its face as to Cronin's invalid-warrant claim against Peters, the Motion to Dismiss this claim on the ground of qualified immunity will be denied without prejudice to raising the issue in a properly supported motion for summary judgment. *See, e.g.*, *Westfall v. Wright*, No. CV 14-6110, 2015 WL 4638330, at *3 (W.D. Ark. Aug. 4, 2015) (it was premature to dismiss defendant when factual allegations did not clearly indicate whether he was entitled to absolute or qualified immunity).

## B. Official-Capacity Claims

Plaintiffs' claims against the Defendants in their official capacities are actually claims against the City of Lincoln itself. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."); *Parrish v. Luckie*, 963 F.2d 201, 203 n.1 (8th Cir. 1992) ("Suits against persons in their official capacity are just another method of filing suit against the entity. A plaintiff seeking damages in an official-capacity suit is seeking a judgment against the entity." (citation omitted)). Therefore, Plaintiffs' claims against Defendants Peterson, Peschong, Jackson, Peters, Koepke, and Reynolds in their official capacities will be dismissed as redundant of their claims against the City of Lincoln. *Veatch v. Bartels Lutheran Home*, 627 F.3d

1254, 1257 (8th Cir. 2010) (proper to dismiss claims against city police officer sued in official capacity as redundant of claims against city); *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1182 (8th Cir. 1998) (district court correctly dismissed § 1983 claim against school official as redundant of same claim against school district).

"Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville, Missouri, 840 F.3d 982, 985 (8th Cir. 2016).* Here, Plaintiffs' Amended Complaint refers only to the City of Lincoln's "custom and practices" that led to violations of Plaintiffs' constitutional rights, not an official municipal policy or a failure to train or supervise.

> To trigger municipal liability based on unofficial municipal custom, the custom must be so pervasive among non-policymaking employees of the municipality that it effectively has the force of law. *Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir. 1998).* The custom must be demonstrated by a continuing, widespread, and persistent pattern of unconstitutional misconduct. *Id.* An unconstitutional custom or usage cannot arise from a single act. *McGautha v. Jackson Cnty., Mo., Collections Dep't, 36 F.3d 53, 57 (8th Cir. 1994).*

*Id.* at 986. Specifically, to establish municipal liability through an unofficial custom of the municipality, a plaintiff must demonstrate:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir.), *cert. denied*, 138 S. Ct. 222 (2017) (internal quotation and citation omitted); *see also Harmon v. St. Louis Cty.*, No. 4:08CV226, 2009 WL 880024, at *7 (E.D. Mo. Mar. 30, 2009) (§ 1983 municipal liability may be established by showing misconduct was "so persistent among the rank-and-file employees of the municipality as to constitute a custom with the force of law" and municipal customs are those practices that are not "authorized by written law," but are "so permanent and well-settled . . . as to [have] the force of law" (internal quotations and citations omitted)).

Here, Plaintiffs have alleged in boilerplate language that each Defendant is "vested by virtue of his position with the City with the power and authority to formulate and enforce the custom and practices which resulted in violations of plaintiffs' constitutional rights." (Filing No. 19 ¶¶ 9, 11, 13, 15, 17, 19.) However, there are no allegations of a continuing, widespread, and persistent pattern of unconstitutional misconduct pursuant to an unofficial municipal custom that was so pervasive among non-policymaking City of Lincoln employees that the alleged custom effectively had the force of law. Rather, Plaintiffs have only alleged various unconstitutional aspects of a single investigation against them, and only them, that lasted less than two years. This is not enough to allege municipal liability. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (shortcomings in investigation of one excessive-force case did not demonstrate continuing, widespread, or persistent pattern of misconduct; stating that "[a] single incident normally does not suffice to prove the existence of a municipal custom"); *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991) (finding no "custom" when issue was school district's response to five incidents of unconstitutional misconduct by one teacher occurring over 16-year period; "five complaints scattered over sixteen years cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct. Viewed from the time at which they occurred, the alleged incidents are relatively isolated and thus, under *Monell*, are insufficient to give rise to Board liability"); *Parsons v. McCann*, 138 F. Supp. 3d 1086, 1100 (D. Neb. 2015) (allegations of police misconduct during

one investigation of one student not sufficient to allege continuing, widespread, persistent pattern of unconstitutional misconduct by City of Omaha police); *Bay v. Bay*, No. 5:11-CV-05256, 2013 WL 3582076, at *9 (W.D. Ark. July 12, 2013) (in case involving city police's investigation, search, seizure, arrest, and interrogation of plaintiff for alleged child sexual abuse, court found no "custom" for purposes of § 1983 municipal liability when plaintiff provided "no examples, other than his own, of citizen complaints about police misconduct"); *Youa Vang Lee v. Anderson*, No. CIV.07-1205, 2009 WL 1287832, at *7 (D. Minn. May 6, 2009), *aff'd sub nom. Lee v. Andersen*, 616 F.3d 803 (8th Cir. 2010) (city not liable under § 1983 for alleged failure to properly investigate one incident of police misconduct when "Plaintiff has not produced any evidence that Minneapolis failed to investigate previous incidents of police misconduct"); *Ward v. City of Des Moines*, 184 F. Supp. 2d 892, 897 (S.D. Iowa 2002) (single alleged excessive-force incident normally does not suffice to prove existence of municipal custom).

Therefore, the Motion to Dismiss Plaintiffs' claims against the City of Lincoln will be granted for failure to state a claim upon which relief can be granted.

Accordingly,

IT IS ORDERED:

1.    Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Filing No. 20) is **granted in part** and **denied in part** as specified below:

a.  Fourth Amendment Claims:

    Plaintiff Cronin's Unlawful Detention Claim Against Defendant Koepke: the Motion to Dismiss is **granted** for failure to state a 42 U.S.C. § 1983 claim based on the Fourth Amendment on this ground and/or because Defendants are entitled to qualified immunity from suit on this claim.

Plaintiff Cronin's Unlawful Arrest Claim Against Defendant Koepke: the Motion to Dismiss is **denied** without prejudice to raising the issue of qualified immunity in a properly supported motion for summary judgment.

Plaintiff Cronin's Invalid Search Warrant Claim against Defendants Peterson and Peters: the Motion to Dismiss is **denied** without prejudice to raising the issue of qualified immunity in a properly supported motion for summary judgment.

Plaintiff Cronin's Unlawful Execution of Search Warrant Claim Against Defendants Koepke and Reynolds: the Motion to Dismiss is **denied in part** because Defendants Koepke and Reynolds are not entitled to qualified immunity based on Plaintiffs' allegations that they executed search warrants for Cronin's home and person without seeing the warrants or knowing what was to be seized and that they searched one of Plaintiffs' vehicles that was not listed in the search warrant for Plaintiff Cronin's car. The Motion to Dismiss is **granted in part** as to Plaintiffs' cell-phone-destruction claim for failure to make any allegations against any named Defendant.

Plaintiff Fullerton's Unlawful Detention Claim Against Defendant Peterson: the Motion to Dismiss is **granted** for failure to state a 42 U.S.C. § 1983 claim based on the Fourth Amendment on this ground and/or because Defendant Peterson is entitled to qualified immunity from suit on this claim.

Plaintiff Fullerton's Prolonged Seizure Claim: the Motion to Dismiss is **granted** for failure to state a 42 U.S.C. § 1983 claim based on the Fourth Amendment on this ground and/or because Defendants are entitled to qualified immunity from suit on this claim.

b.  Fifth Amendment Claim:  the Motion to Dismiss is **granted** for failure to state a 42 U.S.C. § 1983 claim based on the Fifth Amendment and/or because Defendants are entitled to qualified immunity from suit on this claim.

c.  Sixth Amendment Claim:  the Motion to Dismiss is **granted** for failure to state a 42 U.S.C. § 1983 claim based on the Sixth Amendment and/or because Defendants are entitled to qualified immunity from suit on this claim.

d.  First Amendment Retaliation Claim:  the Motion to Dismiss is **granted** for failure to state a 42 U.S.C. § 1983 claim based on the First Amendment and/or because Defendants are entitled to qualified immunity from suit on this claim.

e.  Motion to Dismiss Defendant Peters for Absolute or Qualified Immunity: the Motion to Dismiss is **denied** as to Defendant Peters because she is not entitled to absolute immunity.  However, because Peters may be entitled to qualified immunity on the invalid-warrant claim asserted against her, the Motion to Dismiss Cronin's invalid-warrant claim against Peters on the ground of qualified immunity has been denied without prejudice to raising the issue in a properly supported motion for summary judgment.

f.  Official-Capacity Claims:  the Motion to Dismiss Plaintiffs' claims against the City of Lincoln is **granted** for failure to state a claim upon which relief can be granted.

2.    The claims and Defendants remaining in this suit are as follows:

a.    Plaintiff Cronin's Unlawful Arrest Claim against Defendant Koepke in his individual capacity;

b.    Plaintiff Cronin's Invalid Search Warrant Claim against Defendants Peterson and Peters in their individual capacities; and

      c.        Plaintiff Cronin's Unlawful Execution of Search Warrant Claim against Defendants Koepke and Reynolds in their individual capacities as to the search of Cronin's home, person, and vehicle.

3.      The following Defendants shall be dismissed from this case: Defendant Chris Peterson in his official capacity; Defendant James Peschong in his individual and official capacities; Defendant Brian Jackson in his individual and official capacities; Defendant Tonya Peters in her official capacity; Defendant William Koepke in his official capacity; Defendant Daren Reynolds in his official capacity; and Defendant City of Lincoln.

4.      The court's resolution of the Defendants' Motion to Dismiss resolves all of Plaintiff Fullerton's claims in favor of Defendants. If either party wishes the court to enter judgment under Fed. R. Civ. P. 54(b), such party shall file a motion and supporting brief discussing why the court should, or should not, enter judgment under Rule 54(b).[7]

DATED this 24th day of January, 2018.

BY THE COURT:
s/ *Richard G. Kopf*
Senior United States District Judge

---

[7]*See, e.g.*, *Dean v. Cty. of Gage*, 807 F.3d 931, 937 (8th Cir. 2015).